UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

CSI ENTERTAINMENT, LLC, CSI SPORTS
EVENTS, LLC, and CSI ENTERTAINMENT
EVENTS, LLC,

                              *Plaintiffs*,

            – against –

FLOYD MAYWEATHER, JR. and
FRIST APEX VENTURES LLC,

                              *Defendants*.

-----------------------------------------------------------------X

CASE NO. 1:26-CV-05150 (VSB)

**DECLARATION OF STEPHEN ESPINOZA IN SUPPORT OF SPECIALLY APPEARING DEFENDANT FLOYD MAYWEATHER, JR.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

I, Stephen Espinoza, hereby declare as follows, pursuant to 28 U.S.C. § 1746:

1.      I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. I have personal knowledge of the facts set forth herein, except for those stated on information and belief, and as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to those facts set forth herein.

2.      I am currently an independent sports media consultant and submit this Declaration in support of Specially Appearing Defendant Floyd Mayweather, Jr.'s Opposition to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order.

3.      I am an attorney and sports-media executive with over 25 years' experience in the professional boxing industry. In my previous role as an attorney, I represented professional boxers, including global boxing stars Oscar De La Hoya and Mike Tyson, and boxing promoters, including Oscar De La Hoya's Golden Boy Promotions. I later served as President of Showtime Sports, where I was responsible for, among other things, all negotiations, acquisitions, programming and television production of all boxing events exhibited and distributed by Showtime and Showtime Pay-Per-View. In this capacity, I secured the rights to, and supervised the production and marketing of, many of the biggest and most significant boxing matches in the history of the sport,

1

including the three biggest pay-per-view events in television history. During my tenure, I have negotiated and secured rights to, and supervised the production and marketing of, hundreds of televised boxing matches.

4.    Through these positions, I became intimately familiar with the roles and responsibilities of boxing promoters, managers, broadcasters, and distributors, as well as the commercial factors that drive the success of major boxing events.

5.    I have reviewed certain agreements and pleadings relating to the dispute between Plaintiffs and Floyd Mayweather that are the subject of the pending application for temporary restraining order, including the August 10, 2025 agreement between CSI Sports Events, LLC and Frist Apex Ventures LLC and the November 6, 2025 agreement between CSI Entertainment Events, LLC and Frist Apex Ventures (collectively, the "CSI Agreements")

6.    Based on my review of the CSI Agreements and my extensive experience in the boxing industry, the responsibilities assumed by the CSI entities are responsibilities traditionally performed by a boxing promoter. The CSI Agreements provide that the CSI entities will, among other things, select and contract with the venue, determine event dates, produce the boxing matches, select and contract with fighters, negotiate and pay fighter purses, arrange fighter travel and accommodations, obtain event sponsorships, market and advertise the event, and collect event-related revenues. In my experience, all of those functions are core promoter functions, performed exclusively by licensed promoters. The CSI Agreements assign those responsibilities directly to CSI and do not contemplate that CSI will hire a licensed promoter to perform them.

7.    I have also reviewed allegations in which CSI contends that Mr. Mayweather's participation in an interim fight, specifically here the Zambidis event in Greece, could diminish the value of future events involving Mr. Mayweather.

8.    Based on my extensive experience in the boxing industry, I disagree with the suggestion that a single performance by a fighter necessarily diminishes that fighter's commercial value or drawing power.

9.      As one example, Mike Tyson participated in a widely publicized bout against Jake Paul in November 2024. Tyson lost that fight decisively and, in the view of many observers, did not perform at a high level. Nevertheless, Tyson has remained one of the most recognizable and commercially valuable figures in combat sports following that bout. CSI still finds value in associating with Tyson.

10.     In my experience, legendary fighters often retain substantial commercial value regardless of the outcome of any particular fight. Fan interest is driven by numerous factors, including the fighter's reputation, legacy, personality, and historical accomplishments.

11.     Accordingly, given Mr. Mayweather's status as one of the most skilled, most accomplished and most popular boxers of his generation, I do not believe it is reasonable to assume that participation in a single interim fight would materially diminish Mr. Mayweather's commercial value or the marketability of a future event involving Mr. Mayweather.

12.     I am also intimately familiar with the manner in which major professional boxing events are arranged and staged. A promoter cannot independently stage a fight involving a particular boxer unless that promoter has secured the contractual rights necessary to obtain that boxer's participation.

13.     Based on my understanding, in October 2025 EverWonder obtained exclusive rights relating to Manny Pacquiao's professional boxing services, before CSI entered into its subsequent agreements with Mr. Pacquiao concerning a potential bout involving Mr. Mayweather and Mr. Pacquiao.

14.     To the extent EverWonder possesses exclusive rights to Mr. Pacquiao's boxing services, CSI would not have the independent ability to arrange, promote, or stage a bout involving Mr. Pacquiao, like the Mayweather v. Pacquiao fight, without EverWonder's participation or consent.

15.     Based on my review of the materials provided to me, CSI does not appear to have entered into a direct agreement with Manny Pacquiao. Without the ability to secure Pacquiao's

3

participation, CSI would not have the present ability to independently stage a Mayweather-Pacquiao fight.

16. I am also familiar with the level of public interest and commercial significance associated with major professional boxing events around the world.

17. Based on my experience, the proposed Mayweather-Zambidis event in Greece is a foreign exhibition bout directed primarily toward an international audience. Prior to this dispute, the event's ultimate commercial performance in the United States remained uncertain.

18. I understand that CSI communicated its claims regarding purported exclusive rights to Mr. Mayweather directly to entities involved in the Mayweather-Zambidis event, including Ticketmaster Hellas and DAZN, causing Ticketmaster Hellas to suspend ticket sales and DAZN to withdraw its offer to exhibit the event.

19. In my experience, uncertainty concerning whether an event will proceed often causes fans, sponsors, distributors, and other commercial partners to delay commitments or withdraw participation altogether. As a result, the present dispute has and will likely cause greater harm to the commercial prospects of the Zambidis event than the event could ever cause to CSI.

20. I am also aware that CSI has argued in its Motion for Preliminary Injunction and Temporary Restraining Order that it intends to launch a sports network using the Mayweather v. Tyson fight.

21. Based on my experience in sports media and combat sports broadcasting, the success of a media platform is not dependent upon a single event or a single athlete. Media businesses are built through sustained audience acquisition, recurring programming, distribution relationships, content libraries, and long-term investment. The suggestion that a single exhibition bout involving Mayweather would materially impair the launch or success of a future streaming or media platform is speculative at best.

22. In addition, the sports-media marketplace has changed dramatically in recent years. The industry has largely shifted away from reliance on individual marquee events as the sole driver of subscriber growth. Consumers today have access to a wide range of established sports and

entertainment streaming services, and successful platforms typically require a consistent slate of premium content over time rather than dependence on a single athlete or event.

23.     In my experience, distributors, broadcasters, sponsors, and other commercial partners place substantial value on certainty and reliability. Repeated postponements, shifting event schedules, and uncertainty regarding whether a proposed event will occur often make those entities reluctant to commit resources or maintain existing commitments.

24.     To the extent distributors, broadcasters, sponsors, or other commercial partners have become hesitant to participate in events associated with CSI, that hesitation would be consistent with the uncertainty created by repeated delays in staging the proposed Tyson event and ongoing questions regarding whether those events will actually occur.

25.     Accordingly, I do not believe that the Mayweather-Zambidis foreign exhibition poses any material threat to CSI's claimed plans to develop future media, broadcast, or streaming initiatives.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 23, 2026 at New York, NY.

Signed by:

722080EC71244A0...

Stephen Espinoza