# EXHIBIT E

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF ORANGE**
**CENTRAL JUSTICE CENTER**

**MINUTE ORDER**

DATE: 07/01/2024                    TIME: 09:32:00 AM        DEPT:  C44

JUDICIAL OFFICER PRESIDING: Walter Schwarm
CLERK: A. Lo
REPORTER/ERM:
BAILIFF/COURT ATTENDANT:

CASE NO: **30-2021-01207553-CU-BC-CJC**    CASE INIT.DATE: 06/25/2021
CASE TITLE: **Paradigm Sports Management, LLC vs. Pacquiao**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Breach of Contract/Warranty

EVENT ID/DOCUMENT ID: 74329078
**EVENT TYPE:** Chambers Work - Submitted Matter

**APPEARANCES**

There are no appearances by any party.

The Court, having taken the above-entitled matter under submission on June 5, 2024, and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now issues its Memorandum of Tentative Decision; a copy of which is attached hereto and incorporated herein by reference.

The July 3, 2024, 8:30 AM Status Conference remains. Parties may appear remotely.

Court orders Clerk to give notice.

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE

JUL 0 1 2024

DAVID H. YAMASAKI, Clerk of the Court

BY:_____,DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE - CENTRAL JUSTICE CENTER

PARADIGM SPORTS
MANAGEMENT, LLC,

    Plaintiff

       v.

EMMANUEL DAPIDRAN
PACQUIAO; and DOES 1-50,
inclusive,

    Defendants.

Case No. 30-2021-01207553

MEMORANDUM OF TENTATIVE

DECISION

Hon. WALTER P. SCHWARM

Dept. C44

In this document, the court announces its tentative decision. This tentative decision ". . . is the court's proposed statement of decision, subject to a party's objection under (g)." (Cal. Rules of Court, rule 3.1590(c)(1).) This ". . . tentative decision does not constitute a judgment and is not binding on the court." (Cal. Rules of Court, rule 3.1590(b).) This tentative decision will address ". . . the principal controverted issues at trial . . ." regarding the Declaratory Relief cause of action in the Cross-Complaint. (Code Civ. Proc., § 632.) "A statement of decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its

-1-

decision. [Citations.]" (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125 (*Muzquiz*.) "It is settled that '[i]n rendering a statement of decision under Code of Civil Procedure section 632, a trial court is required only to state ultimate rather than evidentiary facts; only when it fails to make findings on a material issue which would fairly disclose the trial court's determination would reversible error result. [Citations.] . . . .' [Citation.]" (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 745 (*Sperber*).)

## STATEMENT OF CASE

On June 25, 2021 under ROA No. 2, Paradigm Sports Management, LLC filed its Complaint. The Complaint alleged causes of action for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Unjust Enrichment, and Declaratory Relief against Emmanuel Dapidran Pacquiao.  On July 30, 2021 under ROA No. 112 Emmanuel Dapidran Pacquiao filed his Cross-Complaint against Paradigm Sports Management, LLC.  The Cross-Complaint alleged causes of action for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duty, Fraud based on False Promise, Fraud based on Fraudulent Concealment, and Declaratory Relief.[1]  The court conducted a jury trial between April 12, 2023 and May 2, 2023.[2] (April 12, 2023 and May 2, 2023 Minute Orders.)

On April 20, 2023 under ROA No. 727, Mr. Pacquiao filed a Motion for Judgment of Nonsuit based on the illegality of the February 8, 2020, October 11, 2020, and October 23, 2020 agreements between PSM and Mr. Pacquiao.  On April 24, 2023 under ROA No. 732, PSM filed an Opposition to Mr. Pacquiao's Motion for Judgment of Nonsuit.  On April 26, 2023, the court denied Mr. Pacquiao's Motion for Judgment of Nonsuit. (April 26, 2023 Minute Order.)

---

[1] Paradigm Sports Management, LLC is the Plaintiff on the Complaint and the Cross-Defendant on the Cross-Complaint. Emmanuel Dapidran Pacquiao is the Defendant on the Complaint and the Cross-Complainant on the Cross-Complaint. The court will refer to Paradigm Sports Management, LLC as PSM.  The court will refer to Emmanuel Dapidran Pacquiao as Mr. Pacquiao.

[2] The jury trial was the first phase of the trial.

On April 27, 2023, Mr. Pacquiao moved for a directed verdict pursuant to Code of Civil Procedure section 630. (April 27, 2023 Minute Order.)  The court denied the motion for directed verdict. (April 27, 2023 Minute Order.)

On May 2, 2023, the jury returned the following verdicts (May 2, 2023 Minute Order):

1. "On Paradigm's claim for breach of contract other than for Mr. Pacquiao's failure to repay $3.3 million to Paradigm," the jury found in favor of PSM and awarded damages in the amount of $1.8 million. (Verdict Form 5001 filed on May 2, 2023 under ROA No. 762.)

2. "On Paradigm's claim for breach of the implied covenant of good faith and fair dealing other than for Mr. Pacquiao's failure to repay $3.3 million to Paradigm," the jury found in favor of PSM and awarded damages in the amount of $1.8 million. (Verdict Form 5001 filed on May 2, 2023 under ROA No. 762.)

3. "On Paradigm's claim for breach of contract for Mr. Pacquiao's failure to repay $3.3 million to Paradigm," the jury found in favor of PSM and awarded damages in the amount of $3.3 million. (Verdict Form 5001-A filed on 5-2-23 under ROA No. 763.)

4. "On Paradigm's claim for breach of the implied covenant of good faith and fair dealing for Mr. Pacquiao's failure to repay $3.3 million to Paradigm," the jury found in favor of PSM and awarded damages in the amount of $3.3 million. (Verdict Form 5001-A filed on 5-2-23 under ROA No. 763.)

5. "On Mr. Pacquiao's claim for breach of contract," the jury found in favor of PSM. (Verdict Form 5001-B filed on May 2, 2023 under ROA No. 764.)

6. "On Mr. Pacquiao's claim for breach of the implied covenant of fair dealing," the jury found in favor of PSM. (Verdict Form 5001-B filed on May 2, 2023 under ROA No. 764.)

7. "On Mr. Pacquiao's claim for breach of fiduciary duty," the jury found in favor of PSM. (Verdict Form 5001-B filed on May 2, 2023 under ROA No. 764.)

8. "On Mr. Pacquiao's claim for fraud—false promise/misrepresentation," the jury found in favor of PSM. (Verdict Form 5001-B filed on May 2, 2023 under ROA No. 764.)

9. "On Mr. Pacquiao's claim for concealment," the jury found in favor of PSM. (Verdict Form 5001-B filed on May 2, 2023 under ROA No. 764.)

10. "On Mr. Pacquiao's claim for negligent misrepresentation," the jury found in favor of PSM. (Verdict Form 5001-B filed on May 2, 2023 under ROA No. 764.)

On May 17, 2023 under ROA No. 779, Mr. Pacquiao filed his Motion for Judgment Notwithstanding the Verdict (JNOV). On August 2, 2023 under ROA No. 806, PSM filed its Opposition to Mr. Pacquiao's Motion for Judgment Notwithstanding the Verdict. The court continued the JNOV to September 12, 2023 for supplemental briefing. (August 15, 2023 Minute Order.) On September 12, 2023, the court continued the JNOV to October 10, 2023 for a status conference, and the court requested a Joint Statement from the parties. (September 12, 2023 Minute Order.) On October 10, 2023, the court scheduled a court trial for December 15, 2023 as to the Declaratory Relief cause of action in the Cross-Complaint, and set a status conference on December 8, 2023. (October 10, 2023 Minute Order.) On December 8, 2023, the court continued the court trial to January 2, 2024. (December 8, 2023 Minute Order.) On January 2, 2024, the court set a mandatory settlement conference on January 18, 2024, and the court set the JNOV for a status conference on February 16, 2024. (January 2, 2024 Minute Order.) On January 18, 2024, the case did not settle. (January 18, 2024 Minute Order.) On January 24, 2024, the court set another mandatory settlement conference for January 30, 2024. (January 24, 2024 Minute Order.) On January 30, 2024, the case did not settle. (January 30, 2024 Minute Order.) On March 14, 2024, the court continued the court trial to April 5, 2024, and the parties informed the court that ". . . they will meet again with Judge Melzer for an additional Settlement Conference . . . ." (March 14, 2024 Minute Order.) On March 19, 2024, the case did not settle. (March 19, 2024 Minute Order.) On April 11, 2024, the court continued the trial to June 3, 2024 after requesting further briefing. (April 11, 2024 Minute Order.) After continuing the trial from June 3, 2024 to June 5, 2024, the court took this matter under

submission on June 5, 2024 to determine the Declaratory Relief cause of action in the Cross-Complaint. (May 30, 2024 and June 5, 2024 Minute Orders.)

## LEGAL BACKGROUND

### A. *Hoopes v. Dolan*

*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146 (*Hoopes*), states,

"The order of trial, in mixed actions with equitable and legal issues, has great significance because the first factfinder may bind the second when determining factual issues common to the equitable and legal issues. [Citation.] It is well-established in California jurisprudence that '[t]he court may decide the equitable issues first, and this decision may result in factual and legal findings that effectively dispose of the legal claims.' [Citation.] This District Court of Appeal has observed that the 'better practice' is for 'the trial court [to] determine the equitable issues before submitting the legal ones to the jury.' [Citation.] The historical reason for this procedure, at least as concerns equitable defenses, is that the same order of trial was observed when there were separate law and equity courts: 'If a defendant at law had an equitable defense, he resorted to a bill in equity to enjoin the suit at law, until he could make his equitable defense effective by a hearing before the chancellor.' [Citation.] '[T]he practical reason for this procedure is that the trial of the equitable issues may dispense with the legal issues and end the case.' [Citation.] In short, 'trial of equitable issues first may promote judicial economy.' [Citation.]" [¶] California's preference for the trial of equitable issues before legal issues has produced a number of cases in which bench resolution of equitable issues preceded consideration of legal claims, and curtailed or foreclosed legal issues. [Citation.] 'It is well established that, in a case involving both legal and equitable issues, the trial court may proceed to try the equitable issues first, without a jury . . . and that if the court's determination of those issues is also dispositive of the legal issues, nothing further remains to be tried by a jury.' [Citation.]" (*Id.*, at pp. 156-157.) "In a mixed trial of legal and equitable issues where legal issues are first tried to a jury, the court must follow the jury's factual determinations on common issues of fact." (*Id.*, at p. 161.)

### B. Declaratory Relief

" 'The fundamental basis of declaratory relief is the existence of an *actual, present controversy* over a proper subject.' [Citation.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79 (*Cotati*); Italics in *Cotati*.) " 'To qualify for declaratory relief, [a party] would have to

demonstrate its action presented two essential elements: "(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the party's] rights or obligations." ' [Citation.]   (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 909.) *Caira v. Offner* (2005) 126 Cal.App.4th 12, 24 (*Caira*), states,

> "It is well established that a true action for declaratory relief is equitable: [¶] 'An action for declaratory relief is an equitable proceeding and the powers of a court are as broad and extensive as those exercised by such court in any ordinary proceeding in equity [citation]. It is elementary that questions relating to the formation of a contract, its validity, its construction and effect, excuses for nonperformance, and termination are proper subjects for declaratory relief [citation].' [Citation.]"

**C. Legal Authority Relating to the Boxing Act (Bus. & Prof. Code, § 18600)**

Business and Professions Code section 18640 provides in part, ". . . No person shall engage in the promotion of, or participate in, a boxing or martial arts contest, match, or exhibition without a license, and except in accordance with this chapter and the rules adopted hereunder." Business and Professions Code section 18642 states in part, ". . . No person shall participate in any contest or serve in the capacity of a booking agent, manager, trainer, or second, unless he or she has been licensed for that purpose by the commission." Business and Professions Code section 18628 states,

> " 'Manager' means any person who does any of the following: [¶] (a) By contract, agreement, or other arrangement with any person, undertakes or has undertaken to represent in any way the interest of any professional boxer, or martial arts fighter in procuring, or with respect to the arrangement or conduct of, any professional contest in which the boxer or fighter is to participate as a contestant; except that the term 'manager' shall not be construed to mean any attorney licensed to practice in this state whose participation in these activities is restricted to representing the legal interests of a professional boxer or fighter as a client. Otherwise, an attorney shall be licensed as a manager in order to engage in any of the activities described in this section. [¶] (b) Directs or controls the professional boxing or martial arts activities of any professional boxer or martial arts fighter. [¶] (c) Receives or is entitled to receive more than 10 percent of the gross purse of any professional boxer or martial arts fighter for any services relating to such person's participation in a professional contest. [¶] (d) Is an officer, director, shareholder, or member of any corporation or organization

which receives, or is entitled to receive more than 10 percent of the gross purse of any professional boxer or martial arts fighter for any services relating to the person's participation in a professional contest."

*Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1326-1327 (*Castillo*), provides,

"Section 18642 requires a manager to be licensed by the commission. The commission is required to prescribe necessary standards for licensure of managers. (§ 18648.) An application for a manager's license must be in writing and signed under penalty of perjury. (§ 18673.) Contracts between boxers and managers 'shall be executed on printed forms approved by the commission. '(Cal.Code Regs., tit. 4, § 220.) No other form of contract 'may be recognized or enforced by the commission.' (*Ibid.*) 'Unless otherwise directed by the commission, a contract between a boxer and a manager is not valid unless both parties appear at the same time before the commission or a commission representative and it receives written approval.' (Cal.Code Regs., tit. 4, § 222.) A verbal agreement shall not be accepted by the commission. (Cal.Code Regs., tit. 4 § 230, subd. (a).) Acting as a manager without a license is a misdemeanor under section 18878. [¶] The conduct Castillo alleged he engaged in, on behalf of Barrera, falls within the statutory definition of a manager. It bears emphasis that the language of section 18628 broadly defines manager as a 'person who does any' of a variety of duties, including one who 'undertakes or has undertaken to represent in any way the interest of any professional boxer,' 'in procuring, or with respect to the arrangement or conduct of, any professional contest in which the boxer or fighter is to participate as a contestant,' or who '[d]irects or controls the professional boxing . . . activities of any professional boxer.' "

*Castillo* also states,

"It would be inconsistent with the provisions of California law requiring written boxing manager contracts, as well as licensure, to allow Castillo to recover by means of quantum meruit. 'Generally a contract made in violation of a regulatory statute is void. Under this general rule, where a law requires, for regulatory rather than revenue purposes, that one procure a license before offering or performing certain services and provides a penalty for violation, the contract of an unlicensed person to perform such services will not be upheld.' [Citation.] The sound rationale for denying recovery on an oral contract to manage a professional boxer is to deter managers working without a written contract or license from engaging in illegal activity. 'The regulations governing the conduct of matches are designed to "provide safeguards for the protection of persons engaging in the activity" and to protect them "against their own ill-advised participation in an unregulated match." [Citation.] The regulations governing boxing contracts, 4 Cal.Admin. §§ 256–59, 288, have a similar purpose which is, in the words of the

district court, "to safeguard boxers against the temptation to mortgage their futures." ' [Citation.] 'Knowing they will receive no help from the courts in recovering for their illegal activities, managers are less likely to enter into illegal arrangements.' [Citations.]" (*Id.*, at p. 1329.)

*Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 321, states, "While we are not bound by decisions of the lower federal courts, even on federal questions, they are persuasive and entitled to great weight. [Citation.]" "Unpublished federal opinions are ' "citable notwithstanding California Rules of Court, rule [8.1115] which only bars citation of unpublished *California* opinions. Therefore, [*Kirbyson*] [is] citable as persuasive, although not precedential authority. [Citation.]" [Citations.]' [Citations.]" (*Haligowski v. Superior Court (Haligowski)* (2011) 200 Cal.App.4th 983, 990, fn. 4; Italics in *Haligowski*.).)

*Foreman v. George Foreman Associates, Ltd.* (1975) 517 F.2d 354 (*Foreman*), provides,

"While it is true that the place of performance is not confined to California and that it was certainly contemplated that Foreman would engage in boxing and related activities in other states or countries, it is reasonable in such circumstances for the parties to fix the controlling law as that of the state of the contract's execution. [Citation.] The record presents undisputed facts which are more than sufficient to allow the contractual stipulation of California law to be given effect. [¶] But having seen that application of California law renders the contract void, Associates now argues that the stipulation is more honored in the breach than the observance. It relies on the principle that the chosen law of the parties is not to be applied if that law would declare the contract invalid, [citation], and urges this court to follow the 'Rule of Validation' and to seek out the law of some interested state which would validate rather than void the contract. [Citation.]" (*Id.*, at p. 356.) "The choice of law principles which favor validation of contracts function to protect the expectations of the parties. But the regulations governing boxing contracts exist to invalidate contracts despite the expectations of the parties by restricting the boxer's power to contract. Foreman, either fortuitously or by design, contractually invoked the protections afforded him, as well as the restrictions placed upon him, by California law. To now disregard the stipulation would be to begin a search for the law of some other state which would both validate the agreement and have sufficient contacts with the parties or transaction to permit its application. But application of such law, if it could be found, would not be consistent with the public policy of California. The California courts do not hesitate to invalidate a stipulation of governing law

-8-

when application of such law would be contrary to the public policy of California. [Citations.]" (*Id.*, at p. 357.)

*de La Hoya v. Top Rank, Inc.* (2001) 2001 WL 34624886, 4 (*de La Hoya*), states,

"Whether a contract is illegal is a matter of law appropriately resolved on summary judgment. [Citations.] [¶] 'An illegal contract is void; it cannot be ratified by subsequent act, and no person can be estopped to deny its validity.' [Citation.] The illegality of a contract cannot be waived, because the 'parties are not at liberty to waive or ignore the requirements of the law.' [Citation.]"

*de La Hoya* also states, "Top Rank does not dispute that it is not licensed as a manager. As a manager under the Top Rank Contract as defined by section 18628, this failure alone renders Top Rank's contract with De La Hoya illegal and void." (*Id*, at p. 8.)

*George Foreman Associates, Ltd. v. Foreman* (1974) 389 F.Supp. 1308, 1314 (*George Foreman*), provides,

"These abuses ultimately prompted the extensive statutory and regulatory framework administered by the State Athletic Commission, a framework which has been described by the California Supreme Court as evincing 'an unusually strong policy' of public regulation, one of whose primary goals is 'to provide safeguards for the protection of persons engaging in the activity.' [Citation.] The statutes and regulations indicate a clear purpose to safeguard boxers against the temptation to mortgage their futures in exchange for relatively meager present consideration; in light of that purpose, it is appropriate and even necessary to interpret advance payments (such as those made to Foreman under the 1972 Agreement) as falling within the scope of the 'services' which trigger the licensing requirement and other statutory protections." (Footnote 2 omitted.)

## D. Legal Authority Relating to Illegality

*Yoo v. Robi* (2005) 126 Cal.App.4th 1089, 1103 (*Yoo*), states,

"This case falls squarely within the well-settled rule a defense of illegality based on public policy is not waived by the defendant's failure to include it as an affirmative defense in the answer to the complaint. This rule applies because, unlike other affirmative defenses which may be waived if not pled, 'when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract or recover compensation for an illegal act, the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of what public policy forbids.' Furthermore, '[t]he reasons for refusing to enforce an illegal

agreement,' and by implication for declining to find a waiver of the illegality, 'are particularly strong in cases . . . in which the statute invalidating the contract envisions the protection of one class of persons from the unlicensed and unsupervised activities of another.' As discussed above, the Talent Agencies Act was adopted to protect artists seeking employment. Thus, even though there may be some exceptions to the rule of unwaivablility, if a defense based on the plaintiff's lack of a contractor's license is not waived by failing to specifically plead it we see no reason why we should reach a different result in the case of a defense based on the plaintiff's lack of a talent agency license. (Footnotes 21, 22, 23, 24, 25, and 26 omitted.)

In *Russell v. Soldinger* (1976) 59 Cal.App.3d 633, 641 (*Russell*), the court stated, in the context of a nonsuit motion to the opening statement, "The nonsuit in the instant case was granted solely upon the ground that the agreement forming the basis for this litigation was unenforceable as being contrary to public policy and illegal." The court explained,

> "Whether or not a contract in any given case is contrary to public policy is a question of law to be determined from the circumstances of each particular case. [Citation.] [¶] 'It is equally well settled that if the question of illegality develops during the course of a trial, a court must consider it whether pleaded or not, 'and when a court discovers a fact which indicates that the contract involved is illegal and ought not to be enforced, it will, on its own motion, instigate an inquiry in relation thereto . . . Whenever the evidence discloses the relations of the parties to the transaction to be illegal and against public policy, it becomes the duty of the court to refuse to entertain the action. Whether the evidence comes from one side or the other, in the absence of a pleaded and proved exception to the general rule, the disclosure is fatal to the case, and the court is justified in rendering judgment that neither party take anything from the other.' (12 Cal.Jur.2d, p. 306, s 106.)' [Citation.]" (*Id.* at p. 642.)

*ECC Capital Corporation v. Manatt, Phelps & Phillips, LLP* (2017) 9 Cal.App.5th 885, 908 (*ECC*), provides,

> "The cases ECC cites are distinguishable for that reason: They concern a failure to raise the illegality of a contract as an affirmative defense to a suit on the contract. [Citations.] . . . [¶] In stark contrast, in this case it was ECC that sued on a contract, lost, and only then argued illegality in an attempt to avoid paying fees and costs, despite the fact it was aware of the facts offered in support of that argument from the outset of the case. Such tactics were not present in the cases ECC cites, and, if permitted to succeed here, would severely ' "undermin[e] the

advantages of arbitration." ' [Citation.] Under these circumstances, we are not 'unwittingly lend[ing our] assistance to the consummation or encouragement of what public policy forbids.' [Citation.]"

## ISSUE

The cause of action that is still at issue between the parties is the Cross-Complaint's Declaratory Relief cause of action.  (Cross-Complaint—Sixth Cause of Action.)  The issue is whether the contracts entered into between Mr. Pacquiao and PSM are illegal.  (Mr. Pacquiao's Trial Brief (CCTB) filed on 11-3-23 under ROA No. 858; 8:12-13.)

## TENTATIVE RULING

The court finds for Mr. Pacquiao on the Declaratory Relief cause of action and declares the Contract void due to illegality.

## SUMMARY OF RELEVANT FACTS

The parties do not dispute that they entered into the following agreements:

1.  A Partnership Contract dated February 8, 2020 where Mr. Pacquiao and PSM agreed that PSM would act as Mr. Pacquiao's "Exclusive worldwide partner with respect to the procurement, negotiation, execution and management of all employment, opportunities, agreements and the like for **MP's** professional fighting and promotion services with foreign and domestic professional fighting organizations. . . ." (Exhibit 20; 2-8-20 Partnership Contract, ¶ 1(i) (Emphasis in Exhibit 20.).)  The February 8, 2020 Partnership Contract stated PSM ". . . shall be responsible for the procurement, negotiation, execution and management of Fight Contracts, Marketing Contracts, Commercial Opportunities, Industry Opportunities and Media Contracts . . . ." (Exhibit 20; 2-8-20 Partnership Contract, ¶ 2.)

    As to venue and governing law, the February 8, 2020 Partnership Contract states, "This Agreement shall be deemed to have been executed and delivered within California.  Any action brought to enforce the terms of this Agreement shall be brought only in the courts of competent jurisdiction, state or federal, located within Orange County, California and each party hereto consents to the jurisdiction of said Courts." (Exhibit 20; 2-8-20 Partnership Contract, ¶ 20.)

-11-

2. A Partnership Contract dated October 11, 2020 where Mr. Pacquiao agreed that PSM was ". . . MP's exclusive worldwide partner with respect to the procurement, negotiation, execution, and management of all employment, opportunities, agreements, and the like for **MP's** professional fighting and promotion services with foreign and domestic professional fighting organizations (collectively, 'Fight Contracts'), *subject to previous contracts already signed, and previous negotiations already commenced by MP prior to the signing of this contract; . . . .*" (Exhibit 39; 10-11-20 Partnership Contract, ¶ 1(i) (Italics and emphasis in Exhibit 39.).) Under the October 11, 2020 Partnership Contract, the parties agreed that PSM would act as Mr. Pacquiao's exclusive worldwide partner with respect to marketing contracts and commercial opportunities except in Asia and the Middle East. (Exhibit 39; 10-11-20 Partnership Contract, ¶ 1(ii) and (iii).) The October 11, 2020 Partnership Contract stated that PSM was Mr. Pacquiao's worldwide partner and representative as to entertainment opportunities. (Exhibit 39; 10-11-20 Partnership Contract, ¶ 1(iv).) The October 11, 2020 Partnership Contract gave non-exclusive representation to PSM regarding media contracts. (Exhibit 39; Partnership Contract, ¶ 1(v).) The October 11, 2020 Partnership Contract referred to marketing contracts, industry opportunities, media contracts, and commercial opportunities collectively as the "Sponsor Contracts." (Exhibit 39; 10-11-20 Partnership Contract, ¶ 1(vi).)

The October 11, 2020, Partnership Contract states that PSM ". . . shall have the power to procure, negotiate, execute and manage the Fight Contracts, Marketing Contracts, Commercial Opportunities, Industry Opportunities and Media Contracts of MP . . . ." (Exhibit 39; 10-11-20 Partnership Contract, ¶ 2.)

The October 11, 2020 Partnership Contract required PSM to ". . . transfer Four Million United States Dollars . . . to MP as an Advance ('Advance') *as part of this Agreement*." (Exhibit 39; 10-11-20 Partnership Contract, ¶ 6 (Italics in Exhibit 39.).)

As to venue and governing law, the October 11, 2020 Partnership Contract provides, "This Agreement shall be deemed to have been executed and delivered within California, U.S.A. Any action brought to enforce the terms of this Agreement shall be brought only in the courts of competent jurisdiction, state or federal, located within Orange County, California and each party hereto consents to the jurisdiction of said Courts." (Exhibit 39; 10-11-20 Partnership Contract, ¶ 25.)

The October 11, 2020 Partnership Contract states, "This Agreement constitutes the Parties' entire understanding of the matters set forth herein and supersedes any prior understanding or agreement. This Agreement may only be modified in writing by the Parties hereto." (Exhibit 39; 10-11-20 Partnership Contract, ¶ 33.)

3. On October 23, 2020, the parties entered into a Supplemental Agreement. (Exhibit 40.) The Supplemental Agreement deemed the February 8, 2020 Partnership Contract as the "Original Agreement" and the October 11, 2020 Partnership Contract as the "Amended Agreement." (Exhibit 40; Supplemental Agreement; p. 1 at ¶ 2.) The Supplemental Agreement states, ". . . in consideration of the mutual promises hereinafter contained, the Parties hereto agree that the following sections . . . will be amended and superseded those in the Amended Agreement . . . ." (Exhibit 40; Supplemental Agreement; p. 1 at ¶ 3.) The Supplemental Agreement amended sections 3, 6, 7, 9, 16, 17, and 21 of the Amended Agreement. (Exhibit 40.)

The parties do not dispute that PSM entered into a Joint Venture Agreement (JVA) with Ninong Arnold Vegafria and Rafhael "Ping" Nepomuceno on October 1, 2020. (Exhibit 312.) The JVA designated Mr. Vegafria and Mr. Nepomuceno as "Agents." (JVA, p. 1.) The JVA states in part:

"Paradigm is in the business of managing and representing professional prize fighters. [¶] Agents are currently in the business of managing Emmanuel Dapidran Pacquiao, a professional prize fighter ('Fighter'). . . . [¶] The Parties wish to enter into a strategic relationship, as governed by this Agreement, relying on Paradigm's expertise in the combat sports industry on an international level, and the Agents' expertise and relationship with the Fighter." (Exhibit 312; JVA at p. 1.)

As to the $4,000,000 Advance, the JVA states, "Agents shall provide a payment to the Fighter in the amount of Four Million United States Dollars . . . (the 'Purse Advance') as a benefit to the Fighter for signing an amended representation agreement with Paradigm regarding Fighter's professional boxing career." (Exhibit 312; JVA, ¶ 5.) The JVA provides, ". . . The payment to Fighter shall be paid by the Agents personally and will be delivered to the Fighter by Agents only once this Agreement is fully executed, and both the Partnership Contract and Promissory Note are executed by the Fighter." (Exhibit 312; JVA, ¶ 5(b).) "Agents agree to indemnify and hold harmless Paradigm and its affiliates and their respective owners, employees, members, managers, officers directors,

-13-

contractors, successors and assigns (all of such parties including Paradigm, the 'Paradigm Parties') from all claims, obligations, liabilities, losses, expenses, fees, including reasonable attorney fees, costs, and judgments that may be asserted arising from the failure of the Fighter to repay the Purse Advance to the Agents." (Exhibit 312; JVA, ¶ 5(c).)

Audie Attar testified he started Paradigm Sports Management while in business school at Pepperdine University. (Exhibit A attached to filing under ROA No. 828; 4-13-23 RT 7:19-8:5.) Mr. Attar testified:

> "My job as a manager is the athlete advocate. I am the one negotiating on behalf of the athlete against the promoter, right. [¶] So we work together, albeit sitting across the table from one another. But my interests are aligned with the fighter. My job, my goal, is to maximize the fighter's earnings and to protect him from other things and include other things, like disability insurance and other benefits, like owning part of the intellectual property of said event, ensuring that the base pay is also coupled with ancillary revenues like gate revenue, pay-per-view revenue, merchandising revenue, and then monetizing the athlete beyond just that fight." (Exhibit A attached to filing under ROA No. 828; 4-13-23 RT 50:12-51:2.) (Mr. Attar also testified as to a manager's role with respect to a boxer on April 17, 2023 (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 133:16-135:1.).)

Mr. Attar testified he sought to have an Amended Agreement with Mr. Pacquiao. (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 35:6-25.)   Mr. Attar testified that Mr. Pacquiao initially wanted ". . . 4 million, but then, you know, got it down to 2 million." (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 35:26-36:6.) Mr. Attar's reaction to this request was, "No way," and explained, "There's no point of us paying him money if he wasn't going to let us do our job." (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 36:7-12.)  Mr. Pacquiao was paid, $2,000,000. (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 36:13-14.)  As to this $2,000,000 payment, Mr. Attar explained, "Our local partners thought that it was very important that—that if we wanted to get this—this—get him back on track and get him to lean in and to take a fight, that we should advance him the money. . . . [¶] . . . They felt strongly about it.  And I said, 'Listen, I'm willing to take the obligation, right? If you guys think it's that—that important, you guys have pay the money.' (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 36:15-37:1.)  Mr. Attar

-14-

acknowledged that his local partners paid the money. (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 37:2-3.)

As to PSM's representation of Mr. Pacquiao, Mr. Attar testified, "We hadn't represented any boxers full-time up until Manny Pacquiao. And we felt, after our success with Conor McGregor and his boxing debut, that would lead us to more opportunities, which it did. That's why Manny signed with us." (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 143:4-12.)

With respect to Exhibit 312, Mr. Attar acknowledged that the JVA required Mr. Vegafria and Mr. Nepomuceno to pay the money described in Exhibit 312. (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 214:15-218:9 and 222:4-19; See also, (Exhibit C attached to filing under ROA No. 828; 4-19-23 RT 28:6-15.)

Mr. Attar testified he did not believe he had a manager's license for boxers in the State of California in 2019, and he did not recall if he had such a license in 2020 and 2021. (Exhibit C attached to filing under ROA No. 828; 4-19-23 RT 2:4-13.) Mr. Attar did not believe anyone at Paradigm had a manager's license in 2019. (Exhibit C attached to filing under ROA No. 828; 4-19-23 RT 2:14-19.) Mr. Attar testified that he did not personally have and that no one at Paradigm had a promoter's license in 2019, 2020, and 2021. (Exhibit C attached to filing under ROA No. 828; 4-19-23 RT 2:20-3:7.)

Mr. Nepomuceno testified he personally delivered $2,000,000 to Mr. Pacquiao's assistant. (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 58:18-59-12.) Mr. Nepomuceno testified that in September of 2020 he transmitted $2,000,000 in cash to Mr. Pacquiao, and that the money ". . . came from us." (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 90:26-91:25) When asked, "So you agreed to actually indemnify Paradigm if Mr. Pacquiao didn't repay the $4 million purse advance?," Mr. Nepomuceno responded, "It's in the contract. Yeah." (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 99:5-100:13.)

Mr. Vegafria testified he and Mr. Nepomuceno advanced $2,000,000 in October and then another $1,300,000. (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 114:22-

26.) Mr. Vegafria explained that Mr. Attar was ". . . not amenable, actually, 2 million, the next 2 million, because he's – not accepting us that. But I told him I will be the one responsible to – how to – generate funds for this . . . ." (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 149:3-21.)

The court grants Mr. Pacquiao's Request for Judicial Notice (RJN), filed on 4-20-23 under ROA No. 725, as to Exhibits A and C pursuant to Evidence Code section 452, subdivision (h). RJN Exhibit A is a Certificate of Non-Licensure (dated April 18, 2023) from the California State Athletic Commission indicating that Mr. Attar was ". . . not currently licensed as a Manager. He was licensed as a Manager from April 14, 2016 to April 30, 2017, and his license expired after he did not complete the required annual renewal." RJN Exhibit A also indicates that Paradigm Sports Management, LLC "has never been licensed as a manager." RJN Exhibit C is a Certificate of Non-Licensure (dated April 18, 2023) from the California State Athletic Commission indicating that Mr. Attar and Paradigm Sports Management, LLC have never been licensed as a Promoter.[3]

## ANALYSIS

**A. Whether the Contract Supersedes the February 8, 2020 Agreement?**

*Archer v. Coinbase, Inc.* (2020) 53 Cal.App.5th 226, 274-275, states, "We further reject plaintiff's attempted reliance on parol evidence because the User Agreement contains an integration clause stating it is the 'entire understanding and agreement' of the parties. 'When the parties to a written contract have agreed to it as an "integration"—a complete and final embodiment of the terms of an agreement—parol evidence cannot be used to add to or vary its terms.' [Citations.]" (Footnote 6 omitted.)

---

[3] The court does not take judicial notice of RJN Exhibit B because RJN Exhibit B is immaterial to the court's decision. (*Silverado Modjeska Recreation & Parks District v. County of Orange* (2011) 197 Cal.App.4th 282, 307, fn. 18.)

The October 11, 2020 Partnership Contract contains an integration clause at paragraph 33 which expressly states that this contract supersedes any prior agreement. This integration clause also provides for modification if the modification is in writing. Since the February 8, 2020 Partnership Contract is a prior agreement under the integration clause, it is no longer the controlling agreement between the parties. Thus, the court finds that the October 11, 2020 is the controlling agreement between the parties based on the integration clause. The Supplemental Agreement expressly provides that it amends the Amended Agreement. In the Supplemental Agreement, the term Amended Agreement refers to the October 11, 2020 Partnership Agreement. Since the Supplemental Agreement is a writing, it modifies the identified terms contained in the October 11, 2020 Partnership Contract. Based on the above, the court finds that the controlling agreements between the parties are the October 11, 2020 Partnership Contract and the Supplemental Agreement. The court will refer to these two agreements as the Contract.

## B. Whether the Declaratory Relief Cause of Action in the Cross-Complaint is Sufficient to Raise the Defense of Illegality?

PSM's Corrected Responsive Trial Brief (CRTB), filed on November 30, 2023 under ROA No. 868, states, "However, by previously stating his intention to seek leave to amend the pleading to conform to the proof so that they would be deemed to include his illegality defense (which he ultimately chose not to do), Pacquiao has tacitly admitted that his declaratory judgment claim does not encompass illegality." (CRTB; 1:16-19.) The parties do not dispute that Mr. Pacquiao did not plead illegality as an affirmative defense in his Answer to PSM's Complaint. Under *Yoo*, the failure to plead the defense of illegality does not constitute a waiver preventing Mr. Pacquiao from raising the defense during trial. Pursuant to *Caira*, declaratory relief is equitable and that the validity of a contract is a proper subject for declaratory relief. Therefore, the court finds that Mr. Pacquiao's failure to plead illegality as an affirmative defense and the equitable nature of declaratory relief allow the court to address the illegality of the contract between the parties.

### C. Whether Mr. Pacquiao's Illegality Defense is Barred?

The CRTB states, "By seeking declaratory relief as to the parties' rights under contracts that the jury already found he breached, Pacquiao has created a host of problems relating to issue and claim preclusion. 'It is well established that a judgment in an action for breach of contract bars a subsequent action for additional relief based on the same breach.'" (CRTB; 2:19-22.) The CRTB also states, "If Pacquiao had exercised his right to have his declaratory judgment claim tried first, it would have obviated the preclusion concerns that the Court is now faced with following the jury verdict. In the first instance, a jury trial might have been mooted." (CRTB; 3:12-14.)

On April 23, 2023, Mr. Pacquiao made a nonsuit motion based on illegality On April 26, 2023, the court denied the nonsuit motion. (April 26, 2023 Minute Order.) The court agrees with PSM that it would have been preferrable for the court to hear Mr. Pacquiao's Declaratory Relief cause of action before the legal issues in this case. Since Mr. Pacquiao did not affirmatively plead the illegality defense, Mr. Pacquiao did not give the court the opportunity to decide the Declaratory Relief cause of action before trial.

The court, however, does not find that Mr. Pacquiao engaged in the type of gamesmanship as the Plaintiff in the *ECC* case. Here, Mr. Pacquiao raised the illegality defense by way of nonsuit which was an appropriate procedure. Mr. Pacquiao could have reasonably believed that he did not have evidentiary support for the nonsuit motion until after Mr. Attar's testimony regarding licensing as discussed above. Had the court granted the nonsuit motion based on illegality, the apparent effect of such a ruling would have resulted in the unenforceability of the contract by either side. Thus, by prevailing on the nonsuit motion, Mr. Pacquiao would have lost his causes of action based on the contract. Unlike *ECC*, Mr. Pacquiao did not wait to see if he had prevailed on his causes of action in the Cross-Complaint before raising the illegality defense. Rather, Mr. Pacquiao brought the nonsuit motion which could have resulted in Mr. Pacquiao losing his contract causes of action in the Cross-Complaint when he made the nonsuit motion.

Next, under *Hoopes*, the court is not bound by the jury's findings on the legal causes of action. The jury's findings did not address the illegality issue of the Contract. The jury did not make any factual determinations on common issues of fact between the legal issues submitted to it and the illegality issue raised by Mr. Pacquiao. Therefore, the court is not bound by the jury's verdicts.

The court recognizes that Mr. Pacquiao sought to recover damages based on the breach of the Contract between the parties. It was reasonable for Mr. Pacquiao to bring causes of action based on the Contract because he could not plan his case based on the expectation that the court would find in his favor on the illegality issue. Thus, under *Yoo*, the court finds that Mr. Pacquiao's illegality defense is not barred.

**D. Whether Mr. Pacquiao Waived the Illegality Defense by Ratifying the Contract When He Brought Causes of Action Based on the Contract?**

The court finds that *de la Hoya* is persuasive. In the context of an unlicensed manager, *de la Hoya* clearly states, "Top Rank does not dispute that it is not licensed as a manager. As a manager under the Top Rank Contract as defined by section 18628, this failure alone renders Top Rank's contract with De La Hoya illegal and void." (*de la Hoya, supra*, 2001 WL 34624886 at p. 8.) Under *de la Hoya*, a party cannot ratify an illegal contract, and estoppel does not apply for the purpose of denying the validity of the contract.

*Asdourian v. Araj* (1985) 38 Cal.3d 276, 293 (*Asdourian*), states,

> "Second, a contract made in violation of section 7159 does not involve the kind of illegality which automatically renders an agreement void. The contracts at issue here were not *malum in se*. They were not immoral in character, inherently inequitable or designed to further a crime or obstruct justice. [Citation.] There was nothing 'intrinsically illegal' about the agreements between plaintiff and defendant to repair and remodel the residential property. Rather, the contracts were *malum prohibitum*, and hence only *voidable* depending on the factual context and the public policies involved. [Citation.] [¶] Finally, the facts of this case support the conclusion that the contracts between plaintiff and defendant, while they violated section 7159, should nevertheless be enforced. Defendant is a real estate investor, not an unsophisticated homeowner or tenant. Further, because plaintiff and defendants were friends, who had had business dealings in

the past, the failure to comply with the strict statutory formalities is, perhaps, understandable. [Citation.] Plaintiff fully performed according to the oral agreements. Defendants accepted the benefits of the oral agreements. If defendants are allowed to retain the value of the benefits bestowed by plaintiff without compensating him, they will be unjustly enriched." (Italics in *Asdourian*.)

*Asdourian* is distinguishable for the following reasons. First, *Asdourian* addressed whether a contract between a real estate investor and a contractor was illegal under Business and Professions Code section 7159. *Asdourian* did not address whether a contract between a fighter and a manager was void as illegal under Business and Professions Code section 18628.

Second, in the context of a contract between a fighter and manager, *Castillo* and *de la Hoya* found that a contract between a fighter and a manager was void where a manager was not properly licensed. (*Castillo, supra*, 146 Cal.App.4th 1317, 1329; *de la Hoya, supra*, 2001 WL 34624886 at p. 8.) Given the strong public policy in favor or protecting fighters who engage in professional boxing, the court finds that *de la Hoya* and *Castillo* more appropriately apply to the analysis than *Asdourian* because *Asdourian* did not involve the relationship between a fighter and a fighter's manager. Therefore, the court finds that Mr. Pacquiao did not lose the ability to challenge the Contract with PSM based on waiver, ratification, or estoppel.

### E. Whether the Contract is Illegal?

The parties do not appear to dispute that PSM was a manager within the meaning of Business and Professions Code section 18628 under the Contract. The Contract gave PSM the authority to represent Mr. Pacquiao's interests with respect to the arrangement of any professional contest. (Bus. & Prof. Code, § 18628, subd. (a).) For example, the Contract gave PSM the authority to represent Mr. Pacquiao as his exclusive worldwide partner with respect to Fight Contracts. (Exhibit 39, § 1(i).) Under the Contract, PSM was to receive 10 percent of the gross purse related to Mr. Pacquiao's participation in a professional contest.

(Exhibit 39, § 8(i).)  As discussed above, Mr. Attar described his role as a manager was to negotiate on behalf of the athlete, and to maximize the fighter's earnings.  Based on this evidence, the court finds, by a preponderance of the evidence that PSM was a manager within the meaning of Business and Professions Code section 18628.

As a manager, Business and Professions Code section 18642 required PSM to have a license from the State Athletic Commission (Commission). (Bus. & Prof. Code, § 18621.) The parties do not appear to dispute that PSM did not have a license from the Commission when the parties entered into the Contract.  Mr. Attar's testimony supports that PSM did not have the required license.  The judicially noticed documents also support that PSM did not have the required license. Based on the evidence, the court finds that Mr. Pacquiao has demonstrated, by a preponderance of the evidence, that PSM did not have the required license under Business and Professions Code section 18642.

Since PSM did not have the required license under Business and Professions Code section 18642, the court finds that the Contract is illegal under *Castillo* and *de la Hoya*. Therefore, the court finds that the Contract is unenforceable.

**F.  Whether the PSM is Entitled to Equitable Relief Based on Unjust Enrichment?**

*George Foreman* states,

> "Part II of this Memorandum and Order discussed at length the reasons for which the 1972 Agreement must be deemed contrary to law and therefore unenforceable. Nevertheless, it is clear that this result threatens to work a substantial injustice upon Associates, which advanced substantial sums of money to Foreman and Sadler in reliance upon the 1971 and 1972 Agreements and which has received relatively little of its anticipated return. This fact is not a sufficient basis for enforcing the agreements themselves, since the private interests of the parties cannot overcome the interest of the state in the enforcement of its laws; however, where the public cannot be protected because portions of a transaction have already taken place, and where one party would be unjustly enriched at the expense of another, the courts have fashioned equitable remedies to mitigate the harshness of this result. Southfield v. Barrett, 13 Cal.App.3d 290, 294, 91 Cal.Rptr. 514, 516 (1970), and cases cited therein. [¶] The present case seems a

highly appropriate one for the application of this principle." (*George Foreman, supra*, 389 F.Supp. at p. 1316.)

Under *George Foreman*, the court has the authority to prevent the unjust enrichment of one party where the court has voided a contract based on illegality. The issue is whether Mr. Pacquiao was unjustly enriched at PSM's expense when he received $3,300,000 from Mr. Vegafria and Mr. Nepomuceno. The court finds, by a preponderance of the evidence, that Mr. Pacquiao was not unjustly enriched at PSM's expense. The evidence supports that PSM did not provide the funds advanced to Mr. Pacquiao. Mr. Attar acknowledged that his local partners paid the money. (Exhibit B attached to filing under ROA No. 828; 4-17-23 RT 37:2-3.) Mr. Nepomuceno testified he personally delivered $2,000,000 to Mr. Pacquiao's assistant. (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 58:18-59-12.) Mr. Vegafria testified he and Mr. Nepomuceno advanced $2,000,000 in October and then another $1,300,000. (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 114:22-26.) Mr. Vegafria explained that Mr. Attar was ". . . not amenable, actually, 2 million, the next 2 million, because he's – not accepting us that. But I told him I will be the one responsible to – how to – generate funds for this . . . ." (Exhibit D attached to filing under ROA No. 828; 4-20-23 RT 149:3-21.) PSM did not present bank records to show that it transferred any payment as part of the advance to Mr. Pacquiao.

Further, the JVA expressly required Mr. Nepomuceno and Mr. Vegafria to provide the $4,000,000 payment to Mr. Pacquiao. (Exhibit 312; JVA, ¶ 5(a) and (b).) The indemnification provision of the JVA specifically provided that Mr. Nepomuceno and Mr. Vegafria would hold harmless PSM for any claims asserted against it from Mr. Pacquiao's failure to repay the advance to Mr. Nepomuceno and Mr. Vegafria. Based on the conduct of Mr. Nepomuceno and Mr. Vegafria in providing the payment of 2,000,000 to Mr. Pacquiao, the lack of bank records showing that PSM provided any money to Mr. Pacquiao, and the terms of the JVA placing the responsibility of providing the advance on Mr. Nepomuceno and Mr. Vegafria, the court finds, by a preponderance of the evidence, that Mr. Pacquiao was not unjustly enriched at PSM's expense. Further, under *Hoopes,* the jury's verdicts do not bind the court because the verdicts

did not ask the jury to determine the source of the $3,300,000. Therefore, the court finds that PSM is not entitled to $3,300,000 as unjust enrichment.

### G. Whether the California Law Requiring a Manager's License Should Be Applied to Out-Of-State Activity?

PSM's Opposition to Mr. Pacquiao's Motion for Judgement for Nonsuit (Opposition to Nonsuit), filed on April 24, 2023 under ROA No. 732, states, "Here, Pacquiao's position would render the Commissions [*sic*] violative of the dormant Commerce Clause for two reasons. [¶] **First**, it would regulate extraterritorially by depriving other states or foreign countries from applying its own laws such that any contract with a California management company would overrule the state law and regulations of another state or country concerning boxing." (Opposition to Nonsuit; 5:23-27 (Emphasis in Opposition to Nonsuit).) PSM further asserts, "**Second**, even if it were not impermissibly extraterritorial, the Commission's exercise of jurisdiction over contracts executed in another state or country would unduly burden interstate commerce because it would limit the availability of boxing in such states or countries." (Opposition to Nonsuit; 6:3-7 (Emphasis in Opposition to Nonsuit).)

The Contract contains a venue and governing law provision. Under this provision, the parties expressly deemed this Contract as executed in California. (Exhibit 39; ¶ 25.) Under this provision, the parties, specifically chose the courts in Orange County as the location for any ". . . action brought to enforce the terms . . ." of the Contract. (Exhibit 39; ¶ 25.) Enforcement of the terms of the Contract in California does not overrule the laws and regulations of other states because the parties chose to apply California law to their agreement. PSM chose to enforce the Contract in California by filing this action in California.

Further, *Castillo* states, ". . . Castillo was required to comply with California law if he acted as a manager for Barrera, even as to fights held in other jurisdictions. The trial court properly ruled the oral contract was unenforceable, even as to a fight held in Texas." (*Castillo, supra*, 146 Cal.App.4th at pp. 1330-1331.) Similar to *Castillo*, PSM was required

to comply with California law requiring a manager's license even as to fights held in other jurisdictions.  (See also, *Foreman* discussed above.)

### CONCLUSION

Based on the above, the court finds for Mr. Pacquiao on the Cross-Complaint's Declaratory Relief cause of action, and declares the Contract void due to illegality.

Dated:   July 1, 2024

Walter P. Schwarm
Judge of the Superior Court

-24-